**AMALGAMATED CLOTHING WORKERS OF AMERICA, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SAGAMORE SHIRT COMPANY, d/b/a Spruce Pine Manufacturing Co., Respondent.**

**Nos. 19452, 19515.**

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 10, 1966.

Decided June 27, 1966.

Mr. Joel Field, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Jacob Sheinkman, New York City, was on the brief, for petitioner in No. 19452.

Mr. Warren M. Davison, Atty., N. L. R. B., with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, were on the brief, for petitioner in No. 19515 and respondent in No. 19452.

Mr. J. W. Alexander, Jr., Charlotte, N. C., of the bar of the Supreme Court of

North Carolina, pro hac vice, by special leave of court, with whom Mr. John L. Kilcullen, Washington, D. C., was on the brief, for respondent in No. 19515.

Before BAZELON, Chief Judge, and FAHY and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

These consolidated cases relate to an order of the National Labor Relations Board.[1] The Board adopted the Trial Examiner's findings that Sagamore Shirt Company (Company) had violated Sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act[2] in the following respects: The Company refused to recognize and bargain with the Amalgamated Clothing Workers (Union) which represented a majority of the workers. Company supervisors, *i. e.* floorladies, interfered with, restrained, and coerced employees in the exercise of their rights guaranteed by the Act. The Company posted a coercive notice concerning the Union in the plant. The Company's plant manager, Shay, interrogated an employee about her visit with Union organizers. The Company's subsequent unlawful conduct contributed to the conditions which created the Union's loss of majority. The Board's Order enjoined continuance of these unlawful practices and directed the Company to bargain collectively with the Union. The Board also adopted the Examiner's findings that a speech by Shay was within the protection of section 8(c) and did not violate the Act, and that the Company did not apply its no-solicitation rule in a discriminatory manner. The Board accordingly dismissed the complaint relating to these charges and the Union has filed a petition to review (No. 19452). Also pending before us, in No. 19515, is the Board's petition to enforce the order entered against the Company.

The underlying facts established in findings of the Examiner, approved by the Board, and supported by substantial evidence, are as follows: The Company, which has its general offices and its administrative staff at its plant in Fall River, Massachusetts, operates a plant in North Carolina employing 106 production and maintenance employees, mostly women, engaged in the manufacture of shirts. In the spring of 1963, the Union, already the bargaining agent for the employees in Massachusetts, began organizing activities among the Company's employees in North Carolina. By early October, the Union had obtained signed authorization cards from more than one-half of the plant's production and maintenance workers. On October 14, 1963, the Union wrote to the Company advising of this fact, and requesting that the Company recognize and bargain with the Union. The Union offered to submit the authorization cards to a count by an impartial third party.

On October 16, the Company posted a notice on plant bulletin boards stating its opposition to the Union's campaign and mailed a copy of the notice to each employee. Plant manager Shay, by letter of October 22, rejected the Union's claim to majority status and its request for recognition and bargaining, suggesting that the Union petition for a Board-conducted representation election.

The next day, October 23, the Union filed a representation petition with the Board. After a hearing on November 22, the Regional Director issued a Decision and Direction of Election on December 4, and scheduled a representation election to be conducted on December 19 among the plant's production and maintenance workers. In this decision the Regional Director found that the Company's floorladies were supervisors under the Act and therefore were to be excluded from the unit.

The Board found that the Company's floorladies warned the employees that

---

1. Sagamore Shirt Co., 153 N.L.R.B. #27 (1965).

2. Act of July 5, 1935, 49 Stat. 449, as amended, 29 U.S.C. § 151 et seq. (1964). Section 8 of the Act appears at 29 U.S. C. § 158 (1964).

plant manager Shay would close down the plant rather than deal with the Union, in some cases threatened to make it hard on union supporters, and interrogated employees concerning their union activities. On December 18, Shay convened the employees and delivered a speech concerning the union. That same day, the Union filed an unfair labor practice charge with the Board. The Regional Director canceled the representation election, and subsequently granted the Union's request to withdraw its representation petition.

I. *The Company's Right to Relitigate the Supervisory Status of Its Floorladies.*

The first question before us is the supervisory status of the floorladies, since it was on the basis of that status that activities of the floorladies were held to constitute a violation of section 8(a)(1) on the part of the Company. At the unfair labor practice hearing before the Examiner, the Company attempted to establish that the floorladies were not supervisors under the Act. The Examiner held that since no appeal had been taken from the Regional Director's determination of December 4 that the floorladies possessed supervisory status, the issue could not be relitigated in the present proceeding. The Examiner relied on Pittsburgh Plate Glass Co. v. N. L. R. B., 313 U.S. 146, 158, 61 S.Ct. 908, 85 L.Ed. 1251 (1941), and the Board's Rule § 102.67(f), adopted in 1961, which pro-

vides that "[f]ailure to request review [of the Regional Director's determination] shall preclude such parties from relitigating, in any related subsequent unfair labor practice proceeding, any issue which was, or could have been, raised in the representation proceeding." [3] The Company filed specific exceptions to this ruling, but the Board's opinion does not make any reference to them. Board counsel now argues that we, too, are bound by the Regional Director's decision in light of the Company's failure to appeal that decision immediately to the Board.

Prior to 1961 the Board itself heard representation questions and determined the proper unit for an election. In that framework a series of decisions evolved with respect to contest of such Board determination. It was early held that parties could not obtain judicial review of the Board's determination of the proper unit for an election at the time such determination was made.[4] Congress expressly recognized that allowing such appeals would delay the holding of many elections and encourage labor strife.[5] Upon the finding of an unfair labor practice for refusing to bargain with the union after its post-election certification, the company could appeal to the courts and at that time test the validity of the earlier unit determination.[6]

It was also early held by the Board,[7] with the concurrence of the courts,[8] that

3. 29 C.F.R. 133 (1966).

4. See Boire v. Greyhound Corp., 376 U.S. 473, 476–479, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); May Dep't Stores Co. v. NLRB, 326 U.S. 376, 66 S.Ct. 203, 90 L. Ed. 145 (1945); AFL v. NLRB, 308 U. S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940). If the Board acts outside its jurisdiction, however, such action can be challenged immediately by suit in the District Court. Leedom v. Kyne, 358 U.S. 184, 188, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). The scope of Leedom v. Kyne is a restricted one. Boire v. Greyhound Corp., *supra*.

5. See AFL v. NLRB, *supra*, note 4, 308 U. S. at 410, 60 S.Ct. 300; *Hearings Before Senate Comm. on Ed. & Labor on S.*

*1000 et al.*, 76th Cong., 1st Sess., 584–87; H.R. REP. No. 510, 80th Cong., 1st Sess., 56–57.

6. Cases *supra* note 4. Section 9(d) of the Act makes it clear that the reviewing court, on appeal from a finding of an unfair labor practice, will have before it, as part of the record, the proceedings in the representation hearing.

7. See, *e.g.*, United Dairies, Inc., 144 N.L.R. B. 153, 154 (1963); National Van Lines, 123 N.L.R.B. 1272, 1273, n. 4 (1959); *but cf.* Plaskolite, Inc., 134 N.L.R.B. 754, 755 n. 2 (1961); New Orleans Laundries, Inc., 114 N.L.R.B. 1077, 1086 (1955).

8. See, *e.g.*, Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 146, 158, 61 S.Ct. 908, 85

at the subsequent hearing on the charge of refusal to bargain the Board need not allow the company to relitigate before the trial examiner or the Board questions concerning the unit determination previously made by the Board. In short, the company's appeal to the court had to be based on the record made at the earlier representation hearing.

When the unfair labor practice charge following a representation proceeding was not a refusal to bargain, however, the Board did not completely preclude relitigation, in the unfair labor practice hearing, of a question determined at the representation hearing. The leading decision is Leonard Niederriter Co., 130 N.L.R.B. 113 (1961), where the company was charged with an unfair labor practice for discharging an employee whom the Board had found to be an employee rather than a supervisor in a previous representation proceeding. The Examiner said:

It is the trier of these facts' understanding, based upon a study of the following cited cases, that the Board's findings and conclusions in a prior representation case *existing at the time of such decision* are binding on the Trial Examiner in a subsequent unfair labor practice proceeding absent evidence which was newly discovered or unavailable to the respondent at the time of the representation hearing. [130 N.L.R.B. at 120, n. 9.]

The Board disagreed, holding:

Contrary to the Trial Examiner, the finding in the earlier representation case * * * that Schwartz was not a supervisor did not finally and conclusively resolve that issue for the purposes of this case involving alleged violation of Section 8(a) (3) and (1) of the Act. [130 N.L.R.B. at 115, n. 2.]

Prior to the Board's *Niederriter* decision, Congress, aware of the huge backlog of cases confronting the Board, due in large part to the number of representation petitions on file,[9] amended the Taft-Hartley Act to allow the Board to delegate to its Regional Directors the power to make unit determinations, to order elections and to certify the results thereof, subject to discretionary review by the Board.[10]

In 1961, subsequent to *Niederriter*, the Board promulgated regulations regarding such delegation. Section 102.67(b) of the Board's rules provides that any party to a representation proceeding may file a request for review by the Board within ten days after the decision of the Regional Director.

Section 102.67(f), relating to failure to seek or accord such review by the Board, provides as follows:

The parties may, at any time, waive their right to request review. Failure to request review shall preclude such

L.Ed. 1251 (1941); Rockwell Mfg. Co. v. NLRB, 330 F.2d 795, 797–798 (7th Cir.), cert. denied, 379 U.S. 890, 85 S.Ct. 161, 13 L.Ed.2d 94 (1964); NLRB v. West. Ky. Coal Co., 152 F.2d 198, 200 (6th Cir. 1945), cert. denied, 328 U.S. 866, 66 S.Ct. 1372, 90 L.Ed. 1636 (1946).

9. See S.Rep. No. 187, 86th Cong., 1st Sess., 29–30 (1959), U.S.Code Congressional and Administrative News 1959, p. 2318 in I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 425–26 (hereinafter Leg.Hist.); II Leg.Hist. 1326(1) (remarks of Senator Morse); *id.* at 1722(3) (remarks of Representative Udall).

10. "The Board is also authorized to delegate to its regional directors its powers

under section 159 of this title to determine the unit appropriate for the purpose of collective bargaining, to investigate and provide for hearings, and demine whether a question of representation exists, and to direct an election or take a secret ballot under subsection (c) or (e) of section 159 of this title and certify the results thereof, except that upon the filing of a request therefor with the Board by any interested person, the Board may review any action of a regional director delegated to him under this paragraph, but such a review shall not, unless specifically ordered by the Board, operate as a stay of any action taken by the regional director." 73 Stat. 542 (1959), 29 U.S.C. § 153(b) (1964).

parties from relitigating, in any related subsequent unfair labor practice proceeding, any issue which was, or could have been, raised in the representation proceeding. Denial of a request for review shall constitute an affirmance of the regional director's action which shall also preclude relitigating any such issues in any related subsequent unfair labor practice proceeding. [29 C.F.R. 133 (1966).]

This rule carries over the earlier Board practice precluding relitigation in a "related" unfair labor practice hearing of an issue determined in a representation hearing, even though now the representation determination may have been made by the Regional Director.

The rule is clear enough where the company seeks to justify an alleged refusal to bargain on the ground that the earlier unit determination is incorrect. Here, however, the unfair labor practice charge relating to the activities of the floorladies is not a charge of refusal to bargain, nor is it either established by or dependent upon a finding of refusal to bargain. Indeed, coercion by supervisors is unlawful even where the union does not represent a majority. The situation is one that comes within the scope of *Niederriter*. Board counsel emphasizes that *Niederriter* preceded the issuance of the rule under discussion. But the Board has never held that its 1961 decision in *Niederriter* was scrapped by the rule promulgated later that year.[11] The trial examiners have differed in their approaches. Some of them have felt that even in situations similar to *Niederriter*, the result is now changed by virtue of the 1961 rule, and the representation determination by the Regional Director is binding.[12] Other examiners have argued that such determination of the Regional Director should not be given more than "persuasive relevance,"[13] on the theory that the new regulations were not intended "to give more binding effect to a Regional Director's decisions than to a decision issued by [the Board] * * *."[14] Reference to the cases cited in the footnotes discloses that the Board has affirmed both these sets of examiner decisions, without any opinion or comment.

■■ In our opinion, the Board's rule against relitigation "in a subsequent unfair labor practice proceeding" does not give an employer sufficient notice that his failure to pursue all of his remedies in the representation proceeding means he will be disabled, regardless of the context of the subsequent proceeding, from challenging each and every issue "which was, or could have been, raised in the representation proceeding." A more natural reading of the rule, in the absence of express provision to the contrary, is one which precludes relitigation only in a "related" subsequent unfair labor practice proceeding, construed in accordance with the doctrine announced in *Niederriter* a few months prior to the new regulation. Where a company is charged with refusal to bargain with a union certified after election, the proceeding is sufficiently "related" to the representation proceeding to preclude relitigation of such common issues as the scope of the appropriate unit and employees therein. Where, however, as in

11. Courts do not rely upon theories in support of Board action advanced for the first time by Board counsel on appeal. See *e.g.*, NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 444, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

12. See, *e.g.*, Thrifty Supply Co., 153 N.L.R.B. #34 (1965); Thunderbird Hotel, Inc., 152 N.L.R.B. #144 (1965); Duval Engineering & Contracting Co., 132 N.L.R.B. 852 (1961).

13. See, *e. g.*, National Freight, Inc., 154 N.L.R.B. #47 (1965); Security Guard Service, Inc., 154 N.L.R.B. #4 (1965); Ertel Mfg. Co., 149 N.L.R.B. 312 (1964); Cabinet Mfg. Corp., 140 N.L.R.B. 576 (1963). The standard used apparently comes from the decision in N.L.R.B. v. Southern Airways Co., 290 F.2d 519, 522–523 (5th Cir. 1961).

14. Shreveport Packing Corp., 141 N.L.R.B. 1255, 1259 (1963) (in absence of objection, trial examiner's opinion adopted *pro forma* by Board).

this case, the part of the charge involved in the relitigation issue is not refusal to bargain, but rather interference with rights of organization, the proceedings are not so related as to foreclose presentation to the Board of the underlying issues.

■ This construction of section 102.67(f) of the Board's rules, which estop relitigation in a related proceeding, is in accordance with the long-held objective of avoiding undue and unnecessary delay in representation elections. There will be cases where an employer will be as interested as the Board in holding a speedy election and will be willing to forego the presence of a given employee in the unit or his vote in the tally. We see no basis for assuming that the Board wishes to require such an employer to delay the election while he completely litigates subsidiary questions, such as supervisory status, in an effort to protect his rights in the future on matters other than the determination of the unit and eligible voters therein.[15]

■ In the interest of clarity we may note that the Trial Examiner and the Board need not allow the Company to relitigate the issue completely. The evidence at the earlier hearing need not be reheard but could, as it was in this case, be incorporated into the record, upon being specifically identified. The findings of the Regional Director may be accorded "persuasive relevance," a kind of administrative comity, aiding the Examiner and the Board in reaching just decisions, subject however to power of reconsideration both on the record already made and in the light of any additional evidence that the Examiner finds material and helpful to a proper resolution of the issue.

We remand the question of the supervisory status of the floorladies to the Board for further consideration in ac-

---

15. We appreciate that the regulation does not automatically provide a stay pending appeal, but compulsory litigation in the representation proceeding (in the sense of litigate now, or lose the right to litigate later) will entail at least the delay incident to a full-blown hearing before the Director, and possibly also a delay where the Board grants a stay on request for review. See § 102.67(b) of the Board's rules. 29 C.F.R. 132–133 (1966).

Regulations are to be construed in the light of their function to constitute a meaningful guide to conduct. If the Board deliberately intended that its regulation overrule the *Niederriter* result, it should have at least attempted to define the scope of disability to relitigate, *i. e.,* to state what it meant by "related proceedings" beyond a hearing on a complaint issued where an employer refuses to bargain with a certified agent on the ground of impropriety or invalidity in the certification. On a question of this importance it would seem desirable, if not mandatory, to further the objective of regulations as a meaningful guide to conduct by providing one of the "statements of general policy, or interpretations" contemplated by § 3(a) (3) of the Administrative Procedure Act, 60 Stat. 238 (1946), 5 U.S.C. § 1002 (1964).

We appreciate that the delegation regulation changed the pre-*Niederriter* situation in one relevant respect. The Board might not be as alarmed about a flood of representation appeals when it was no longer required to consider those on the merits but could dispose of them by denying leave to appeal, denying certiorari so to speak.

Even pretermitting issues of validity and of tolerable scope of res judicata to other proceedings, it is our view, as noted above, that more explicit regulatory language, and probably also accompanying analysis, is requisite before a court will give full scope to a regulation that on its face seems to say: Appeal now or forfeit the right to dispute responsibility for the actions of a small group held to be supervisors, even though they are not important for "election" purposes.

We are not unaware of the objection in terms of strict logic to a result whereby at approximately the same time the same issue is decided in different ways for different purposes. See NLRB v. Scullin Steel Co., 161 F.2d 143, 149–150 (8th Cir. 1947). However, the possible differences in result are related to the Act's objective of reducing threats to and interferences with interstate commerce, such as would be wrought by unnecessary encumbrances in election proceedings, either through comprehensive litigation before the Regional Director or multiplication of petitions to the Board for leave to appeal, *e.g.,* a finding of supervisory status.

cordance with our decision and we will delay any review of the nature of the activities of the floorladies until the question of their status has been determined by the Board.

II. *Validity of the Union Authorization Cards.*

The Examiner concluded that the Company had violated section 8(a) (5) by its refusal to bargain. He based this finding on his view that the Company had no good faith doubt about the Union's majority status when it requested recognition, as shown by the fact that the Company refused to submit the authorization cards to a neutral party for verification, and that the Company subsequently engaged in unfair labor practices aimed at undercutting the union majority.

■ A finding that the Company has violated its statutory duty to bargain entails two prerequisite findings: first, that a majority of the members of the appropriate bargaining unit have freely designated the Union as their bargaining agent; and second, that the Company's denial of recognition was not in good faith.[16] Union authorization cards suffice to establish the first requirement where they fairly reflect an intention of the signers to designate the Union as their bargaining agent. The Examiner found that of the 106 members of the unit, 60 had signed valid cards, though upon examination of the record we can find reference to only 59.[17]

The Company's primary objection is that a number of these cards were obtained on the representation that they were to be used for obtaining an election. The Board first discussed the question of such representations in Englewood Lumber Co., 130 N.L.R.B. 394 (1961), where it found:

[T]he Union did not tell the employees that by signing the cards they were authorizing the union to represent them; rather, the employees were told that the cards were necessary in order that the Board might conduct an election by secret ballot in which every employee would have an opportunity to express his preference. [130 N.L. R.B. at 394–95.]

The Board, stressing that it was considering what the employees were told and not their subjective reactions, found that "we do not think it can reasonably be said that the employees, by their act of signing authorizations, thereby clearly manifested an intention to designate the Union as their bargaining representative." *Id.* at 395. Then, in Cumberland Shoe Corp., 144 N.L.R.B. 1268, 1269 (1963), the Board held that unless employees were told that an election "was the only purpose of the cards," the employees would be held to the terms of the cards which in that case clearly and explicitly stated that the employee was authorizing the union to act as his bargaining agent. This was enforced on appeal, NLRB v. Cumberland Shoe Corp., 351 F.2d 917 (6th Cir. 1965).[18]

■ The wording of the authorization card is an important factor in determining whether an employee meant to authorize the union as his bargaining agent. Where a card is clear on its face, as designating the union as bargaining agent, it is not subject to parol impeachment merely because the employee was told that the purpose of the card was to secure an election. International Union, UAW v. NLRB, 124 U.S.App.D.C. ——, 363 F.2d 702, decided June 15, 1966. The card itself effectively advises the employee of the purpose to constitute the union as bargaining agent. The validity of a clear card is vitiated only when the oral inducement expressly states that the *only* purpose of the card was to obtain

16. NLRB v. Richard W. Kaase Co., 346 F.2d 24, 30 (6th Cir. 1965); NLRB v. Koehler, 328 F.2d 770, 773 (7th Cir. 1964); NLRB v. James Thompson & Co., 208 F.2d 743, 748 (2d Cir. 1953).

17. The Trial Examiner refers to 47 signatures verified by a Union solicitor. Only 46 names appear in the record.

18. See generally Lewis, *The Use and Abuse of Authorization Cards in Determining Union Majority*, 16 LAB.L.J. 434 (1965).

an election. However, as stated in Morris & Associates, Inc., 138 N.L.R.B. 1160, 1177 (1962), "where the purported authorization is questionable on its face * * * what the employees are told assumes greater importance. * * * "[19] When an authorization card itself is unclear about its purpose and no reason is given an employee for signing other than that "this card is to be used to obtain an election," the fair inference is that the only reason the employee is signing is to obtain an election. In such circumstances the card itself has so little thrust as signaling an authorization intention, that its effectiveness for that purpose is undercut even though the union representatives did not say in so many words that its "only" purpose was to assure an election.

In the case at hand, the authorization cards are anything but clear. The card on its face says nothing about the Union, not to mention authorization. It only states:

"I .........................., now
 (Print full name here)
employed by ................... Company, SUBSCRIBE TO THE PROVISIONS PRINTED ON THE REVERSE SIDE OF THIS CARD." There is a place for signature at the bottom of the face side of the card. The reverse side has no place for signature but contains 19 lines of print, which include the statement that the employee (identified as "I" on the face)—"have voluntarily accepted membership in Local Union .......... of the AMALGAMATED CLOTHING WORKERS OF AMERICA (AFL–CIO), and designate said Union as my bargaining agency in all matters pertaining to wages, hours and other conditions of employment."[20]

There was testimony before the Examiner that some employees had no idea that anything was on the reverse side of the card, let alone that it was a combination membership, union-authorization card. We do not agree with the Union's claim that the cards themselves conclusively establish that signers were choosing the Union. Where the union does not provide its organizers with cards clearly informing employees of their purpose, the union must face the possibility that the effectiveness of the cards may be undercut by parol testimony showing that the purpose presented to the employees was that of securing an election and that the purpose of union authorization was not mentioned.

The Board held the cards conclusive of Union authorization in the absence of testimony that their "only" purpose was to arrange an election. These cards are not entitled to such great

---

19. See NLRB v. Cumberland Shoe Corp., 351 F.2d 917, 920 (6th Cir. 1965); NLRB v. Winn-Dixie Stores, Inc., 341 F.2d 750, 754 (6th Cir.), cert. denied, 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965).

20. There are also spaces provided for the date, social security number, job, employee's address and the Company's name and location.

The complete text of the reverse side of the card is:

"have voluntarily accepted membership in Local Union of the AMALGAMATED CLOTHING WORKERS OF AMERICA (AFL–CIO), and designate said Union as my bargaining agency in all matters pertaining to wages, hours and other conditions of employment, I hereby authorize my employer (the above named company) to deduct from my wages my dues and initiation fee due to said Union. This authority to make such deduction shall be irrevocable for the period of one year or until the termination date of the collective bargaining agreement between my Employer and the Union whichever occurs sooner, and I agree and direct that this authorization shall be automatically renewed and shall be irrevocable for successive periods of one year each or for the period of each succeeding collective bargaining agreement between my Employer and the Union whichever shall be shorter, unless written notice is given by me to the Employer and the Union not more than twenty (20) days and not less than 10 days prior to the expiration of each period of one year or of each collective bargaining agreement between my Employer and the Union, whichever occurs sooner. If a new worker: this authorization becomes effective at the end of my trial period."

weight. Moreover, even on the Board's own approach there is error in its finding that "there is * * * no evidence that anyone was told that the card was being solicited for the *sole* purpose of obtaining an election." The record discloses three witnesses testifying to that effect, unshaken on cross-examination. Edna Stiles said that she was told that she was not joining the Union and that the card "was just to show I wanted it brought to an election." Ruth Cox said she was told "he [the solicitor] wanted to get the girls to sign cards so that they could hold the election, but that didn't mean we were for the Union." Mary Stamey said she was told her signature would "give the other girls their fair chance to have an election * * *" and "that this did not mean that I was joining the Union. This was for an election." These three cards should not have been counted toward the Union's majority.

■ No other testimony was adduced on this point. The Company argues, however, that it made a relevant proffer of proof which the Examiner rejected. We think the proffer was insufficient. Initially Company counsel offered the employee witnesses solely for testimony that they had voluntarily gone to see Shay to tell him of their opposition to the Union. The Examiner ruled this would be cumulative, as it clearly would have been. Company counsel then formally stated his proffer for the record, and this time he mentioned—in passing—that employees would testify they "were asking for an election and joining the union." The Examiner did not allude to this aspect of the remarks of Company counsel, but in any event, that proffer would not have established that the employees had only been told that the purpose of the cards was for an election.

After the proffer was rejected, the Examiner granted Company counsel time to gather a list of the witnesses proffered. When counsel presented the list he again stated the substance of the testimony they would give. This time that projected testimony was stated in different words, as forecasting that they would testify that they were told the only purpose of the cards was to obtain an election. If counsel intended to offer numerous witnesses with testimony undermining the authorization cards, it was incumbent upon him to make that fact clear at that time. Company counsel's restatement of the proffer was not flagged as a revision of the proffer, and we do not think the slight changes in wording fairly alerted the Examiner that the substance of the proffer was being changed. Hence it cannot now be used as a substitute for proof in the way Company counsel now desires.

■ The Company also contends that Union solicitors made false statements to at least some card signers that a majority of the workers had already signed union authorization cards. Such puffing does not vitiate the cards unless the comments were a means of coercing employees to sign cards out of a fear of majority reprisal.[21] There was no showing that any threats were used against a signer of a card other than employee Styles, whose card we have already discarded. After correction for the Board's errors, described above, the record still supports the Board's finding that the Union represented a majority of the unit. The Company argues, in the alternative, that in any event it had a good faith doubt about the Union's majority status, and we turn to that contention.

III. *The Company's Good-Faith Doubt as to Majority Status.*

■ The record is replete with testimony by signers and nonsigners of authorization cards that they voluntarily went to Shay's office to tell him both that they opposed the Union and that they thought most of the employees they talked to were likewise opposed. The Examiner seems to have assumed, with-

21. See NLRB v. H. Rohtstein & Co., 266 F.2d 407, 409 (1st Cir. 1959); Freeport

Marble & Tile Co., 153 N.L.R.B. #63 (1965).

out deciding, that such statements could provide an employer with a reasonable doubt about majority status, but he found that in this case the coercive activities of the floorladies and the refusal of management to verify the number of cards held by the Union demonstrated that the Company did not have a good faith doubt about the Union's majority, but was rather seeking to destroy the majority. Obviously an employer cannot seek delay of an election solely in an attempt to undercut a union majority.[22] Here, however, the Examiner's finding rests upon the assumption that the Company was responsible for the conduct of the floorladies. Accordingly, we remand the question for further consideration should it be determined on remand that the floorladies are not supervisors. If they are supervisors, the Company is responsible for their conduct.

## IV. *The Company Notice.*

The day after the Union sought recognition, the Company posted a sign, edged in red, stating its position with regard to the Union. The Trial Examiner found that this notice constituted "further interference, restraint, and coercion in violation of Section 8(a) (1) of the Act." The notice, in its pertinent parts, states:

> Since the Amalgamated Clothing Workers of America has been putting on another campaign to get in here, a good many questions have arisen with regard to the following matters. We have decided to state the Company's

position on these questions as clearly as we can for everybody alike:

> (1) This matter is, of course, one of concern to the Company. It is also, however, a matter of serious concern to you and our sincere belief is that if the Union were to get in here it would not work to your benefit but, in the long run would itself operate to your serious harm.

> (2) It is our intention to oppose the Union and by every proper means to prevent it from coming into this operation.

On numerous occasions in the past, the Board has consistently found generally similar notices, particularly the statements that a union would work to the "serious harm" of the employees, to be veiled threats of company reprisal should the union succeed in its campaign for recognition.[23] The circuit courts of appeals that have thus far considered the point have disagreed with the Board [24] and held that the expression of opinions such as these is protected by section 8(c).[25] In one case the Company's belief "that a union would not work to our employees' benefit but to their serious harm" was revised to drop the last five words and the court, in approving the notice, commented that the company "has, wisely we think, eliminated this critical language." [26] In the present case, the notice retains a reference to "serious harm"

22. Joy Silk Mills, Inc. v. NLRB, 87 U.S. App.D.C. 360, 369, 185 F.2d 732, 741 (1950), cert. denied, 341 U.S. 914, 71 S. Ct. 734, 95 L.Ed. 1350 (1951); NLRB v. Taitel, 261 F.2d 1 (7th Cir. 1958), cert. denied, 359 U.S. 944, 79 S.Ct. 725, 3 L.Ed.2d 677 (1959).

23. See, *e. g.*, Surprenant Mfg. Co., 144 N.L. R.B. 507, 510–511 (1963); Rea Construction Co., 137 N.L.R.B. 1769, 1774, 1777 (1962); White Oak Acres, Inc., 134 N.L.R.B. 1145 (1961).

24. See Surprenant Mfg. Co. v. NLRB, 341 F.2d 756, 760 (6th Cir. 1965); NLRB v. Threads, Inc., 308 F.2d 1, 9 (4th Cir. 1962), *accord* Wellington Mill Div., West

Pt. Mfg. Co. v. NLRB, 330 F.2d 579, 583 (4th Cir.), cert. denied, 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1964).

25. "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 61 Stat. 142 (1947), 29 U.S.C. § 158(c).

26. See NLRB v. Southwire Co., 352 F.2d 346, 348 (5th Cir. 1965).

but is more subdued than some previously approved, since it states that the Union will cause harm to accrue to the employees "in the long run."

 Counsel for the Board argues that this court should defer to the Board's expertise in interpreting the true meaning of this notice in the context in which it was displayed. In the absence of extrinsic or accompanying circumstances, this notice in and of itself cannot reasonably be construed as a "threat of reprisal or force" as required by the Act.[27] The notice may take a different coloration by virtue of the accompanying circumstances. *Cf.* Holmes, J., in Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 62 L.Ed. 372 (1918). But the non-coercive character of the notice taken by itself precludes its prohibition unless the Board, endowed with the lens of an expert, provides explanatory findings revealing that the words take on a darker hue when viewed in the perspective of the particular setting. The Board's only explanation here is that "particularly in light of the other unfair labor practices found herein, we agree with the Trial Examiner that the above-mentioned portion of the notice violated Section 8(a)(1)." As we understand it, the Examiner's interdiction of the notice was based on the authority of Board precedents rather than an assessment of the particular facts in this case. We deem it significant that the Examiner found that the statements in Shay's speech, which were also foreboding of loss of jobs,[28] were not coercive, and did not contain impermissible threats or promises. The speech was avowedly appraised in its context. The Board adopted this finding, and we cannot say it is unsupported by substantial evidence.

In light of this discussion, therefore, we affirm the Board's finding that Shay's speech was not in violation of the Act and deny enforcement to that portion of the Board order directed against the notice.

V. *Application of the Company's No-Solicitation Rule.*

 The notice posted by the Company also contained a clause stating:

(6) No person will be allowed to carry on Union organizing activities on the job. Anybody who does so and who thereby neglects his own work or interferes with the work of others will be subject to discharge.

The Union complains that this no-solicitation rule was discriminatorily applied. The only incident cited occurred shortly after Shay's speech on the day before the scheduled election, when an employee (Gilly) was allowed, without any restraint by the floorlady, to gather together workers on Company time to go to Shay's office to express their support of his position. The Examiner also relied upon testimony that the employees knew that they were not to wander around during working hours but "were supposed to stay at our job." The Board, in upholding the Examiner, stated that, since the record did not disclose that the Company had ever invoked the sanctions of the no-solicitation rule against any employee for Union activities in the plant, there had been no discriminatory application of the rule. The Board specifically noted that no one had contested the validity of the no-solicitation rule itself. Moreover, it was the assumption of the Board, supported by substantial evidence, that the activity was a purely spontaneous employee demonstration not

---

**27.** The Fourth Circuit has held similar statements "unqualifiedly privileged under the provisions of section 8(c) of the Act." Wellington Mill, *supra* note 24, 330 F.2d at 583. Other circuits have upheld the notice without reference to the context in which it was posted. See note 24 *supra.*

**28.** Shay stated in his speech:
"It will be two years next week that I have been here in Spruce Pine, and I have seen this plant grow from the beginning. Girls, as far as my position is concerned, I am not worried, I always have a job to go to."

attributable to suggestion, much less stimulation, by Company management.[29]

The Union argues that it is unfair and improper to require that a worker supporting the Union must jeopardize his job by subjecting himself to possible discharge before the Company can be held responsible for its discriminatory application of its no-solicitation rule. We do not agree with the Board if and to the extent that it implied that there could be no discrimination until there was an imposition of sanctions under the no-solicitation rule. The Company's failure to honor a request that pro-union employees have access to their fellow workers equal to that available to anti-union employees, would support a finding of impermissible discrimination.[30] But here the Union made no such request. We cannot say that the Board had no rational basis for concluding that there was no discrimination in the application of the no-solicitation rule.[31]

## VI

■ ■ Two points remain. The Examiner's finding that Shay had violated section 8(a)(1) by interrogating one employee about her visits with the Union is supported by substantial evidence in the record. And we reject the Union's contention that the Board was required to adopt a broader cease and desist order. See NLRB v. Express Publishing Co., 312 U.S. 426, 433, 61 S.Ct. 693, 85 L.Ed. 930 (1941); Communications Workers v. NLRB, 362 U.S. 479, 480–481, 80 S.Ct. 838, 4 L.Ed.2d 896 (1960).

The Board's order and rulings brought before us in No. 19452 are affirmed.

In No. 19515, the Board's order with regard to Shay's interrogation is entitled to enforcement. Enforcement is denied that portion of the order requiring the Company to cease and desist from posting and distributing the notice. The remainder of the case is remanded to the Board for further proceedings in accordance with this opinion.

It is so ordered.

FAHY, Circuit Judge (concurring in part and dissenting in part):

I concur in the opinion of the court except in the following respects:

1. (a) In Part I, while I agree the Company may "relitigate" the supervisory status of its floorladies, for the reason stated by the court, I think such "relitigation" should be limited to consideration, by the trial examiner and Board, of the floorladies' status on the basis of the evidence adduced in the representation proceeding, provided, however, that upon a showing of good cause therefor the trial examiner or the Board in the exercise of a sound discretion may permit the introduction of additional evidence.

(b) On the remand should the floorladies be found to be supervisors so much of the Board's order as rests upon their activities should be enforced; if otherwise found, the order should be modified as may be required.

2. In Part IV I would sustain the position of the Board as to the notice given by the Company to the employees, believing that it was within the competence of the Board in all the circumstances to find that the notice was coercive. The Board reached this conclusion, "Particularly in the light of the other unfair labor practices found."

---

**29.** Shay's reference in his speech to the fact that workers were free to visit him stands against a background of the Company's long-standing practice under which workers were free to visit Shay's office.

**30.** See, *e. g.*, NLRB v. American Furnace Co., 158 F.2d 376, 379 (7th Cir. 1946); Niskayuna Consumers Cooperative, Inc., 155 N.L.R.B. #23 (1965).

**31.** See NLRB v. United Steelworkers, 357 U.S. 357, 363, 78 S.Ct. 1268, 2 L.Ed.2d 1383 (1958); Gem Int'l, Inc. v. NLRB, 321 F.2d 626, 629–631 (8th Cir. 1963); Kimbrell v. NLRB, 290 F.2d 799, 802 (4th Cir. 1961). But see Allen-Morrison Sign Co., 79 N.L.R.B. 904, 906, 917 (1948).